UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 3:15-CR-160-JAM |
| v. | ) | |
| | ) | |
| ISAIAH GAMBLE | ) | August 23, 2016 |

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

The Defendant, Isaiah Gamble, respectfully submits this memorandum for the Court's consideration in connection with his sentencing hearing, currently scheduled for September 6, 2016, at 10:00 a.m. By this memorandum, Mr. Gamble seeks a sentence of time served, followed by a period of supervised release with conditions that seek to continue his rehabilitation, including participation in Support Court.

**PRELIMINARY STATEMENT**

On September 15, 2015, law enforcement arrested Isaiah Gamble following crack cocaine sales made to a female undercover officer in the north end of Hartford. The officer likely had been introduced by someone more familiar to Mr. Gamble from the neighborhood. The officer ordered quantities over the phone, and Mr. Gamble made the sales. The parties have stipulated that the total quantity is 11.2 to less than 16.8 grams over the course of the transactions. Each transaction was brief and fairly straightforward.

Mr. Gamble was detained from the time of his arrest until November 4, 2015. He went from living in Hartford's North End, going from his elderly grandmother's home to staying with friends to staying with other family and so on, to the harsh reality of

confinement in a facility where there are men facing decades or even life in prison. His ambling, self-directed life suddenly became rigorously directed by others.

Upon his release, Isaiah returned to Connecticut, but not to Hartford's North End. He was released on location monitoring and a number of conditions. Among them, he is not permitted in Hartford other than for treatment, meetings with the U.S. Probation Office or counsel, and other matters approved by the Probation Office.

With no opportunity to go back to grandma's or to bounce among friends' places, Isaiah turned to his father. The two had become estranged over time, but they have been living together since Isaiah's release. Isaiah also has received strong support from other family members, including adult siblings who are regularly employed and serve as positive role models for Isaiah.

At the time of his arrest, then just 20 years old, Isaiah had yet to have a conviction. He has prior arrests in Hartford that have been resolved, and he has pending charges in the Geographical Area Court in Manchester of disorderly conduct and second-degree failure to appear. The failure to appear charge arises from his having missed a court appearance while in custody at Wyatt Detention Center. Those charges should resolve shortly after sentencing.[1]

Upon his release, Isaiah engaged in a number of activities, as directed by the U.S. Probation Office. He attended schooling to enable him to obtain his license to become a barber. That school closed suddenly, but Mr. Gamble still views further educating

---

[1] Mr. Gamble's defense counsel in that matter reports that the State is unwilling to dismiss the charges, and that the parties have agreed to postpone the matter until after this sentencing is resolved. To avoid the need for repeated appearances, the parties agree to have the matter put on the trial list, but do not intend to proceed to a trial.

himself as part of his future. Isaiah also progressed through the MRT program coordinated through the Probation Office, including participating in community service.

Now, this case reaches a crossroads. While there are factors that may favor a period of incarceration, such as the Guidelines advisory range of 18 to 24 months (although the comparable quantity of powder cocaine yields a range of 6-12 months), Isaiah's progress during pretrial release, his youth, his lack of prior convictions, his family support, and other factors warrant emphasizing his continued rehabilitation, which is best served through a sentence of time served, with supervised release to follow. In the event that he falters significantly on supervised release, the Court will have the discretion to effectively impose a term that effectuates the Guidelines range noted here.

## **Isaiah's Youth**

Isaiah's childhood -- his life, essentially, given that he only recently turned 21 years old -- is not an uncommon one in the courts. He was raised in an impoverished section of a struggling Connecticut city. With the pervasive poverty came exposure to drug trafficking, violence, and substance abuse.

In that setting, Isaiah specifically experienced instability early. His parents were not together when he was born. He spent most of his time with his mother, while his closest brother most of his time with their father. Outside the home, he saw drug deals and often heard shootings. When he was in first grade, the family home in the ghetto burned to the ground.

Isaiah's perspectives and experiences continued to be marked by instability. While in elementary school, his mother married again. While Isaiah reports that the two fostered a good relationship, his step-father currently is incarcerated and was incarcerated during his youth. His mother recognized her son's need for a positive male influence and sought help. See Regine LaBossiere, *Breaking Patterns: Older Mentors Guide Children Of Prisoners*, Hartford Courant (June 5, 2005) ("Isaiah is 10, excels at math and enjoys sports and ice cream. But because his stepfather served time, Isaiah is statistically more likely than other children to end up in prison too, according to some studies.")

Matters worsened, however, as his mother passed away due to illness in 2010, when Isaiah was about 15 years old. Without her, the self-proclaimed "mamma's boy" has struggled and drifted. He struggled to finish school, and he has drifted in the North End of Hartford, including abusing substances.

The arrest, the period of detention, and residing with his father away from Hartford appears to have stopped the drifting. Continuing his rehabilitation through supervision should suffice to maintain Isaiah on a positive course and deter him from engaging in criminal conduct.

## **<u>ARGUMENT</u>**

### **I. <u>THE BASIC SENTENCING FRAMEWORK</u>**

The Court must impose a sentence that is "sufficient, but not greater than necessary." 18 U.S.C. § 3553(a). Title 18, United States Code § 3553(a) provides a list of factors for the Court to consider in making its determination of a reasonable sentence, of which the following are the most pertinent here:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
>
> > A. to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> >
> > B. to afford adequate deterrence to criminal conduct;
> >
> > C. to protect the public from further crimes of the defendant; and

D. to provide the defendant with needed education or vocation training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentence available;

(4) the kinds of sentence and sentencing range established for –

A. the applicable category of offense committed by the applicable category of defendant as set forth in the Guidelines

B. . . . .

(5) any pertinent policy statement –

A. issued by the Sentencing Commission . . .

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; . . .

In *United States v. Crosby*, the Second Circuit set out the following analysis for approaching sentencing.

> First, the Guidelines are no longer mandatory. Second, the sentencing judge must consider the Guidelines and all of the other factors listed in section 3553(a). Third, consideration of the Guidelines will normally require determination of the applicable Guidelines range, or at least identification of the arguably applicable ranges, and consideration of applicable policy statements. Fourth, the sentencing judge should decide, after considering the Guidelines and all the other factors set forth in section 3553(a), whether (i) to impose the sentence that would have been imposed under the Guidelines, i.e., a sentence within the applicable Guidelines range or within permissible departure authority, or (ii) to impose a non-Guidelines sentence. Fifth, the sentencing judge is entitled to find all the facts appropriate for determining either a Guidelines sentence or a non-Guidelines sentence.

*Crosby*, 397 F.3d 103, 113 (2005). Under § 3553(a)'s "parsimony clause," it is the sentencing court's duty to "impose a sentence sufficient, but not greater than necessary to

comply with the specific purposes set forth" at 18 U.S.C. § 3553(a)(2). *United States v. Dorvee*, 604 F.3d 84, 93 (2d Cir. May 11, 2010) (citation omitted).

## II. SEVERAL FACTS IMPACT THE APPLICATION OF THE 3553(a) FACTORS IN DETERMINING A SUFFICIENT SENTENCE.

### A. "[T]he nature and circumstances of the offense" Are Significant But Should Not Be Overly Determinative.

The first sentencing factor, 18 U.S.C. § 3553(a)(1), can be broken into several components of importance here, starting with "the nature and circumstances of the offense." Mr. Gamble pled guilty to one count of an indictment charging him with possession with intent to distribute and distribution of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). The maximum sentence is twenty years, and there is no mandatory minimum.

Based on the quantity of crack and a criminal history category of just I, the Guidelines recommend a range of 18 to 24 months. The policy rationale of the narcotics quantity-driven Guidelines has never been more uncertain, however, aside from its continued place as the measure of the most stringent sentences available. *See United States v. Preacely*, 628 F.3d 72, 84 (2d Cir. 2010) (Lynch, J, concurring) ("I note only that no one has ever accused the ordinary Sentencing Guidelines for narcotics offenses of being anything other than stringent."). For example, although the Fair Sentencing Act ("FSA") ameliorated the prior 100:1 powder/crack disparity, that did not resolve the central problem that there is no rational basis to support any disparity in punishment for powder and crack offenses, and the reduce disparity is commonly recognized as the

product of political compromise rather than critical analysis. Meanwhile, more broadly, the entire "War on Drugs" is continually being reconsidered.

Even attorney generals have taken a position that differs from the punishment mantra that pervaded the Department of Justice with the adoption of the U.S. Sentencing Guidelines and the decades that followed. Not too long ago, then-U.S. Attorney General Eric Holder advised federal prosecutors against advocating draconian sentencing measures:

> [R]ecidivist enhancement statutes have resulted in unduly harsh sentences and perceived or actual disparities that do not reflect our Principles of Federal Prosecution. Long sentences for low-level, non-violent drug offenses do not promote public safety, deterrence, and rehabilitation.

Memorandum to the United States Attorneys and Assistant Attorney General for the Criminal Division, August 12, 2013, at 1. Those reforms were not just for mandatory minimums and repeat offenders.

> The reforms we are focused on - and that we think the Commission can help bring about - are changes to statutory and guideline drug penalties. . . We believe drug penalties can be reformed, like many states have done, to focus severe penalties on serious and repeat drug traffickers, while providing alternatives or reduced sentences for non-violent, less serious offenders.

Letter from Attorney General Holder to Hon. Patti B. Saris, Chair, U.S. Sentencing Commission, dated July 11, 2013, at 9, available at https://www.justice.gov/sites/default/files/criminal/legacy/2013/07/11/2013annual-letter-final-071113.pdf.

The comprehensive and informative analysis by an experienced federal judicial officer provides an excellent framework against which to view Attorney General Holder's comments. In *Déjà Vu: a Federal Judge Revisits the War on Drugs, or Life in a Balloon*, by

Hon. Juan R. Torruella, 20 B.U. Pub. Int. L.J. 167 (2010-2011), the First Circuit's Judge Torruella asserts that the Government's then-present drug policies (e.g., pre-August 2013) have created considerable amounts of private and public havoc in our society:

> First, the massive incarceration of our population for drug law violations has not stemmed the tide of drug use in this country. Just to remind you, between 1991 and 1993, approximately 13.9 million Americans (5.8% of our population over 12 years of age), were using illicit drugs, a figure which *increased* to 20.1 million (8.3%) by 2006. This increase took place in the face of an expenditure of almost *one trillion dollars* as part of our government's goal of having a "drug-free America" by 2008, and after the incarceration of more than 500,000 men and women for drug-related offenses during just the period of 2002 to 2006.
>
> Our present approach, "the War on Drugs," makes no sense. Without question, the facts demonstrate that it is a bankrupt way of dealing with the drug problem. As stated by David Dimston, "[t]hat the War on Drugs has been a complete failure is not even a question anymore."' What we have managed to do with this "War on Drugs" is exactly what we did with Prohibition in the 1920's: we have created a powerful criminal subculture with economic power of incredible proportions, allowing it to subvert our economic, social and political systems, while failing to control, much less "prohibit," the use and abuse of the proscribed drug(s).

*Deja Vu*, at 199.

Judge Torruella's broad numbers and statistics play out in individual cases. In *United States v. Haynes*, 557 F. Supp. 2d 200 (D. Mass. 2008), the U.S. District Court for the District of Massachusetts noted that:

> While public safety certainly calls for the incapacitation of some, there is another side to the equation, which, after *United States v. Booker*, 543 U.S. 220 (2005), may finally be given the serious consideration it deserves. The facts presented by Haynes' case force the Court to confront the inescapable fact that disadvantaged communities like Bromley-Heath are injured both by crime and by the subsequent mass incarceration of their young men. See Donald Braman, *Criminal Law and the Pursuit of Equality*, 84 TEX. L. REV. 2097, 2114-17 (2006). Compare Randall Kennedy, *Race, Crime,*

> *and the Law* 373-76 (1997), with Todd R. Clear, *Imprisoning Communities: How Mass Incarceration Makes Disadvantaged Neighborhoods Worse* (2007). Courts may no longer ignore the possibility that the mass incarceration of nonviolent drug offenders has disrupted families and communities and undermined their ability to self-regulate, without necessarily deterring the next generation of young men from committing the same crimes.

*Id*. at 202-03. The District Court sentenced Haynes to time served, in the face of a Guideline range starting at 33 months, so that that "Haynes be permitted to return to his children so that they do not repeat his errors." *Id.* at 203.

Not dissimilar from the circumstances in this case, which was one of several arising from a concerted effort in the North End in the summer of 2015, the *Haynes* case centered around the incarceration of young males in impoverished communities, and the District Court's comments on the interrelationship between punishment, deterrence, and incapacitation of defendants are no less significant here.

> It is clear that punishment plays an important role in deterring crime, but the nature of that relationship is not so clear cut. There is a significant downside to what has been called the American experiment in mass incarceration. Large numbers of people reenter communities that have little or no ability to absorb them, resulting in a constant shuffling and reshuffling of neighborhood residents. And while prisoners are obviously not committing crime in their communities while they are incarcerated, they also are not functioning as parents, workers, consumers, or neighbors. The deterrence message itself may be equivocal: "The effect on these communities is compounded by the fact that imprisonment has become an almost inevitable aspect of the experience of growing up as a black male in the U.S."

*Id.* at 207.

These same issues are raised in this case. Isaiah was living in a Hartford neighborhood known for its drug-related activities. If he is incarcerated, he will not be

contributing to his community as a sober, employable, churchgoing member. Through drug counseling, employment, and education, Isaiah will demonstrate that he can be an important member of a community on the brink of the abyss. Simply put, the context in which the purposes of sentencing should be considered is not as straightforward as considering the role of one man and the response of the federal criminal justice system to his conduct. Punishing, deterring, and incapacitating him impacts his family and a broader community, one which needs more people to serve as a role model for both the ability to recover *and* the existence of opportunities for people with his history. His sentence should reflect the need for such examples.

### B. "[T]he history and characteristics of the defendant" Impact The Calculation Significantly.

The second component of the first sentencing factor, 18 U.S.C. § 3553(a)(1), requires that the Court, to the extent possible, take a close examination of who the defendant is, apart from the conduct at issue in the case at hand. Several facts impact the analysis here.

Isaiah loves his family, especially his grandmother and his closer siblings. One benefit of these events is that the circumstances have brought him closer to his father. His father and other family members provide positive models for the value of hard, honest work. They love him and have supported him throughout.

Isaiah also is young and immature. He has abused substances, engaged in poor decisionmaking, and not shouldered well the burdens and responsibilities that come with adulthood.

His success on pretrial release demonstrates that he can be a different person and live a different life than those aspects of history and characteristics suggest, especially when the substance abuse is held in check. Because he can have success, he has no prior convictions, and he has strong family ties that remain vested in his success, extending his time in prison is not warranted. Close supervision and conditions that include milestones should suffice.

### C. The Goals And Purposes Of Sentencing Require Balancing All Factors And Not Just Focusing On Punishment.

In 18 U.S.C. § 3553(a)(2), Congress set forth an array of policy goals to be considered in sentencing. First, this subsection lists "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." This factor requires that the Court consider the purpose of punishment, while maintaining the integrity of the criminal justice system. Here, a further term of incarceration will serve to derail Isaiah's progress and potentially expose him to the deeper criminality that can pervade the prison system. Likewise, as for deterrence and preventing Isaiah from engaging in recidivist conduct, *see* 18 U.S.C. § 3553(a)(2)(B), that is best served by continuing his treatment in Support Court and requiring that he continue his education or training, or maintain fulltime employment.

The Court, therefore, should focus on rehabilitation. Federal law acknowledges that prison is not really designed for rehabilitation. *See* 18 U.S.C. § 3582 ("The court, in determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in section 3553(a) to the extent that they are applicable, recognizing that imprisonment is

not an appropriate means of promoting correction and rehabilitation."); *see United States v. Pallowick*, 364 F. Supp. 2d 923 (E.D. Wisc. 2005) (departing from 70-87 months to 46 months where defendant was convicted of six armed bank robberies because, *inter alia*, lengthy incarceration would inhibit rehabilitation). That can be best addressed during supervised release, for which the Court should consider ordering a condition that Mr. Gamble either be working or in school (or a training program) for no less than 30 hours per week within a certain time following his sentencing, participate in Support Court, and engage in other activities that will promote further positive steps.

**CONCLUSION**

For all the reasons stated herein, Isaiah Gamble requests that the Court impose a term of time served, followed by a period of supervised release, including any conditions that the Court determines are necessary to effect the purposes of sentencing.

Respectfully submitted,
ISAIAH GAMBLE

/s/Charles F. Willson/s/__________

By Charles F. Willson (# ct24129)
FEDERAL DEFENDER'S OFFICE
10 Columbus Boulevard, 6th Floor
Hartford, CT 06106
Tel: (860) 493-6260
Fax: (860) 493-6269
email: Charles_Willson@fd.org

**<u>CERTIFICATION OF SERVICE</u>**

This is to certify that on August 23, 2016, a copy of the foregoing was filed with the Court via the CM/ECF system, by which counsel to all parties, including the Government, will be notified of and have the opportunity to review this filing.

/s/Charles F. Willson/s/
Charles F. Willson